UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

RECAP INVESTMENTS XI – FUND A,
L.P., RECAP INVESTMENTS XI – FUND
B, L.P., and CARLISLE GP, INC.,

                       10 Civ. 8612

        Plaintiffs,

      -against-

                       **FIRST AMENDED COMPLAINT**

McCULLOUGH HARRIS LLC,

        Defendant.

------------------------------------------------------ X

      Plaintiffs RECAP Investments XI - Fund A, L.P. ("RECAP Fund A") and RECAP

Investments XI - Fund B., L.P. ("RECAP Fund B" and, together with RECAP Fund A, the

"Carlisle Limited Partner"), and Carlisle GP, Inc. ("Carlisle GP" and, together with the Carlisle

Limited Partner and Carlisle GP, "Plaintiffs"), by their attorneys Schindler Cohen & Hochman

LLP, for their Complaint against Defendant McCullough Harris LLC ("McCullough Harris")

allege as follows upon knowledge as to their own acts and upon information and belief as to all

other matters:

1

## NATURE OF THE ACTION

1.      This breach of contract action concerns a real estate limited partnership, known as The Carlisle Apartments, L.P. (the "Partnership"), that owns a 372-unit apartment complex in North Carolina.  The Partnership is governed by a Limited Partnership Agreement of the Carlisle Apartments, L.P. (the "LPA").  Defendant McCullough Harris is the former general partner of the Partnership.

2.      The Partnership is the borrower on a $32.4 million construction loan that comes due on January 2, 2011 and must be refinanced.  Due to McCullough Harris's dishonest and improper conduct as the Partnership's former general partner in connection with the refinancing (or the failure to refinance) the construction loan, and related clear-cut breaches of the LPA, the Carlisle Limited Partner, this past Friday, exercised its express contractual right under the LPA to remove McCullough Harris as general partner and appoint a new general partner, plaintiff Carlisle GP.

3.      Because McCullough Harris has disputed Carlisle Limited Partner's clear legal entitlement to replace it as general partner, Plaintiffs now seek:  (i) declaratory judgment confirming Carlisle GP's right to act as general partner of the Partnership; (ii) a permanent injunction enjoining Defendant from interference with Carlisle GP's performance as general partner of the Partnership; and (iii) a mandatory injunction requiring any necessary cooperation from Defendant.

4.      Plaintiffs' entitlement to replace McCullough Harris as general partner is set forth in the LPA, such that Plaintiffs' claims sound in breach of contract.  McCullough Harris has committed at least three  "Defaulting Events," thereby giving Carlisle Limited Partner the right

under the LPA to convert McCullough Harris's interest into that of a limited partner and to appoint a new general partner.

5.      Specifically, Section 10.4(h) of the LPA prohibits the general partner from prosecuting any causes of action on behalf of the partnership against third parties without the approval of the Carlisle Limited Partner.  Yet, without authorization from Carlisle Limited Partner, McCullough Harris instituted an action for fraud against the project's construction lender, Compass Bank ("Compass").  McCullough Harris also committed a second breach of the LPA by filing a lis pendens on the Partnership property.  This was also expressly prohibited by Section 10.4(d) of the LPA, which provides that the general partner shall not encumber the property without the express approval of Carlisle Limited Partner.  Finally, McCullough Harris's course of conduct, as alleged below, also constitutes a breach of fiduciary duty, which is also a Defaulting Event.  (*See* LPA, Definition of Defaulting Event, Subparagraph (d), p. 5.)

6.      Section 18.1 of the LPA gave Carlisle Limited Partner the right to convert McCullough Harris's general partnership interest into that of a limited partner and appoint a new general partner upon the occurrence of any one of these Defaulting Events.  By written notice, given on November 12, 2010, the Carlisle Limited Partner did exactly that and appointed Carlisle GP to be the new general partner.  McCullough Harris has refused to abide by its removal and the appointment of Carlisle GP as general partner.   Accordingly, to vindicate Plaintiffs' clear rights under the LPA, Plaintiffs are entitled to the declaratory and injunctive relief requested herein.

3

## PARTIES

7.     RECAP Fund A is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 114 West 47th Street, 23rd Floor, New York, New York 10036.

8.     RECAP Fund B is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 114 West 47th Street, 23rd Floor, New York, New York 10036.

9.     Carlisle GP is a corporation organized under the laws of the State of Delaware with its principal place of business at 114 West 47th Street, 23rd Floor, New York, New York 10036.

10.     Defendant McCullough Harris is a limited liability corporation organized under the laws of the State of North Carolina with its principal place of business at 142 Platt Street, Tampa, Florida 33606.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different states and the matter in controversy exceeds $75,000.

12.     Pursuant to 28 U.S.C. § 1391, venue is properly laid in the United States District Court for the Southern District of New York.  Furthermore, venue is proper because the parties contractually agreed to have any disputes heard by the federal courts in New York County.

## FACTS

### The Carlisle Apartments LP

13.     The Partnership was formed by and among McCullough Harris and Carlisle Limited Partner on or about January 2, 2008, pursuant to the LPA for the purposes of acquiring the land for the Property and engaging in all activities necessary for the construction and development thereof.

14.     McCullough Harris is a North Carolina limited liability company created for the purpose of acting as the general partner of the Partnership (and hence, defined as the "General Partner" in the LPA).  McCullough Harris operates out of the offices of a Tampa, Florida-based real estate developer named Phillips Development & Realty ("PDR").  Don Phillips is the founder and Managing Director of PDR.

15.     Pursuant to the LPA, Carlisle Limited Partner (defined in the LPA as the "Investor Partner"), was the initial sole limited partner of the Partnership, and McCullough Harris was the original sole general partner of the Partnership.

16.     As the general partner, McCullough Harris was empowered and responsible for the "management of the Partnership's business and affairs. . . ."

17.     Among McCullough Harris' responsibilities was the hiring of property manager. The LPA provides that Ovation Property Management, LLC ("Ovation"), an entity controlled by Don Phillips, would be the property manager for the Property pursuant to a written and fully executed property management agreement.

18.     Carlisle Limited Partner possesses rights to approve numerous major decisions and actions undertaken by McCullough Harris on behalf of the Partnership.

19.     Carlisle Limited Partner contributed $8,667,000 in initial capital to the Partnership.

20.     McCullough Harris contributed $963,000 in initial capital to the Partnership, about 10% of the total initial equity contributed by the partners.

21.     In addition, the Partnership's acquisition and development of the Property was financed by an approximately $32.4 million loan commitment (the "Loan") from Compass Bank ("Compass") pursuant to a Construction Loan Agreement dated as of January 2, 2008 by and between the Partnership, as Borrower, and Compass, as Lender (the "Loan Agreement") and an accompanying Note also dated January 2, 2008.

22.     The maturity date of the Loan is January 2, 2011 (the "Maturity Date").  The Loan, like most construction loans, is interest-only and, therefore, up until the Maturity Date, the Partnership pays only interest on the Loan to Compass, and, on the January 2, 2010 maturity date, the principal amount of $32.4 million is due to Compass.

**McCullough Harris Ignored Carlisle Limited Partner's**
**Requests To Seek An Extension To the Loan Agreement**

23.     In February or March 2010, Carlisle Limited Partner, realized that, based on, among other things, the income-to-debt ratio on the Property, the Partnership was not likely to meet the requirements to trigger the Partnership's option to renew the Loan pursuant to the various renewal options in the Loan Agreement.  Nevertheless, the limited partner believed that some sort of renewal to the Loan was necessary to maximize the value of the Property (and, necessarily, the Partnership).  Specifically, Carlisle Limited Partner believed that seeking a short-term extension of the Loan (anywhere from six months to two years) would allow the Property's operations to stabilize (primarily through increased occupancy) and allow time for the overall real estate market to rebound.

24.     Carlisle Limited Partner therefore believed it was extremely important that the Partnership reach an agreement on an extension for the Loan. The Loan is a mortgage loan, and therefore, if the Loan is not extended and not repaid in full by the Maturity Date, Compass is permitted to foreclose on the Property and assume ownership thereof. In the event of a foreclosure, Carlisle Limited Partner would lose its entire $8,677,000 capital investment in the Property.

25.     In the real estate market, multi-family rental properties like the Property at issue here, are considered "stabilized" when occupancy levels are above 90%. This is, in part, due to the fact that such properties in North Carolina qualify for Fannie Mae or Freddie Mac financing (among the most generous financing available) only once they have achieved 90% occupancy for 90 days.

26.     In the event that the Loan could not be extended, Carlisle Limited Partner required sufficient time to obtain alternate financing, raise additional capital, or locate a buyer for the Property so as to preserve at least some portion of its equity.

27.     In light of the upcoming Maturity Date and the Partnership's inability to exercise its loan renewal options under the Loan Agreement, on March 9, 2010, Marc Schulder, a Vice President at Real Estate Capital Partners ("RECP"),[1] e-mailed Don Phillips, the principal of McCullough Harris, and suggested that he, in his capacity as principal of the general partner to the Partnership, approach Compass about agreeing to an extension of the Loan. He also asked to be informed of the results of any such communications.

---

[1]     RECP is a real estate investment advisor based in New York, New York. RECP owns 100% of the outstanding and issued stock of RECAP XI GP, Inc., which is the general partner of RECAP Fund A and RECAP Fund B – which together constitute the Carlisle Limited Partner.

28.      Phillips rejected this request, wishing to delay approaching Compass about an extension until closer to the Maturity Date as a means of increasing financial pressure on the bank.

29.      Thereafter, on several occasions throughout the summer, Schulder sought a meeting with Phillips to discuss a strategy for the Partnership.  Schulder stressed that the impending maturity of the Loan required immediate action.

30.      By July, Carlisle Limited Partner was negotiating with Compass on a different property, and it had developed positive business relationships with Compass executives. Accordingly, the limited partner thought the bank would be receptive to discussing a deal to extend the Loan.  But Phillips apparently made no effort to contact Compass.  Indeed, during the summer, Phillips communicated no progress on negotiating an extension to the Loan.

31.      In September and October, when Phillips finally began communicating about the Loan, he insisted that Compass would not agree to an extension.

32.      In RECP's extensive experience in similar situations, it was highly unusual for Compass – or, for that matter, any bank – to refuse outright to discuss extensions or other loan modifications.  Phillips' representations seemed particularly odd to RECP, because as recently as September 2010, Compass and RECP had successfully worked out a deal regarding an unrelated property in Atlanta on which the loan was in default.  RECP had a good relationship with Compass, and so it seemed exceedingly odd that the bank would refuse to entertain options to arrange for an extension to the Loan.

33.      Around this time, Phillips' comments also began to suggest that he had motivations other than those in the best interests of the Partnership.  For example, RECP partner Sylvia Gross had a phone conversation with Phillips after she learned that Phillips had recently

had the loan for another development deal of his – in which he acted as the general partner and developer – sold to a third party investment group named Tonti. Phillips called her at home that evening and boasted, in substance, that he had wiped out "the other partner" on that deal. He also mentioned that he was now having difficulties with Tonti, but that he was not going to let them get away with it and that he had a "terrible reputation" and was "going to use it."

34. Phillips also, on several other occasions, informed Carlisle Limited Partner that he had other loans with Compass for other real estate development deals and that he could not do anything with respect to the Loan that would jeopardize his other loans.

**The Partnership Sues Compass Without Carlisle Limited Partner's Knowledge**

35. On September 23, 2010, without seeking the Carlisle Limited Partner's consent and, entirely unbeknownst to Plaintiffs or RECP, McCullough Harris, on behalf of the Partnership, filed a lawsuit against Compass in Florida state court. In addition to the Partnership, Don Phillips sued on behalf of the limited partnerships of **other real estate development partnerships** in which he is involved. The filing of the lawsuit breached Section 10.4(h) of the LPA, which provides that, absent approval from Carlisle Limited Partner, McCullough Harris shall not "prosecute, waive, settle or compromise any claims or causes of action of the Partnership against any third party. . . ."

36. In connection with this Florida lawsuit, the Partnership also filed in Mecklenberg County, North Carolina a lis pendens on the Property.

37. McCullough Harris also failed to seek Carlisle Limited Partner's approval prior to filing such lis pendens, and this action too was taken entirely without Plaintiffs' or RECP's knowledge or consent. Thereafter, McCullough Harris never informed Carlisle Limited Partner about the notice. Filing the lis pendens, therefore, constituted a breach of Section 10.4(d) of the

LPA, which provides that McCullough Harris shall not "subject all or any portion of the Partnership's property to any Mortgage, lien or other encumbrance or pledge any Partnership assets..." without Carlisle Limited Partner's prior approval.

**McCullough Harris Continues Its Disturbing Behavior**

38.　　On September 28, 2010, without any advance notice, McCullough Harris sent Carlisle Limited Partner a letter seeking a capital call in the amount of $11,350,000 ($5,675,000 from both of McCullough Harris and Carlisle Limited Partner).  In the capital call notice, Don Phillips stated that the rationale for the additional capital infusion was that "[i]t has come to [McCullough Harris's] attention that Compass Bank, the lender of the [Loan], intends to sell the promissory note and related loan documents that evidence the [Loan]. . . ."  Further, because the buyer of the Loan will "likely intend to foreclose" on the Property and because, purportedly, the maximum financing the Partnership could achieve was approximately $22 million whereas the outstanding principal on the Loan was approximately $33 million, McCullough Harris deemed it necessary to have $11,350,000 available to satisfy the Loan immediately.  (*Id.*)

39.　　Carlisle Limited Partner did not meet this capital call because it was not obligated to under the LPA.  The Loan was not in default, and therefore, even if the Note was sold, repayment would not be due until the Maturity Date.  Therefore, the capital call for immediate funds was unfounded.

40.　　At the request of Carlisle Limited Partner, on Monday October 11, 2010, Don Phillips and one of his employees, Tim Graff, flew to New York and met with representatives of Carlisle Limited Partner including, Marc Schulder, Sylvia Gross, Paul Doocy, and Jeremy Katz, all RECP personnel.  At this meeting Phillips asked for Carlisle Limited Partner's permission to engage a broker to sell the Property immediately.  Sylvia Gross, on behalf of Carlisle Limited

Partner, responded that the limited partner would not approve any effort to sell the Property until the Partnership – with the participation of Carlisle Limited Partner – first spoke with Compass about an extension to the Loan.

41.     As set forth above, Carlisle Limited Partner believed that a sale at that time would not have maximized the Property's value.  As of the date of Phillips' request, the Property was near, but had not quite reached 90% occupancy.  Accordingly, the limited partner believed that a short extension of six months would enable the Property to reach "stabilization" and thereby maximize the sale price.

42.     Phillips agreed to speak to Compass.  Schulder confirmed this understanding later that evening in an e-mail to Phillips with a list of agreed-upon action items.  Among such items, Schulder related his understanding that Phillips was to "[c]ontact Compass to schedule an in-person meeting or a conference call for sometime this week. . . ."

43.     Strikingly, at no time before during or after this meeting did Phillips or any representative of McCullough Harris reveal that it had filed suit against Compass accusing the bank of fraud or that it had a filed a lis pendens against the Partnership's own Property.

44.     Nevertheless, the very next day, Phillips sent Schulder a letter ignoring Carlisle Limited Partner's requests to meet with Compass.  Instead, Phillips wrote that Compass had "been resolute in their intent to quickly dispose of the note" and that the "bank has absolutely no reason/need to enter into any extension agreement with us since they have no intent in holding this note until maturity."

45.     Phillips' resistance to speaking with Compass troubled Carlisle Limited Partner. In RECP's experience, in almost every similar deal, the limited partner and the general partner worked together to discuss loan extensions with the lending bank without issue.  In this case, a

loan extension would only help the Partnership buy time to increase the value of the Property,
which, in turn, would raise the Property's market value.

46.     By e-mail dated October 13, 2010, Gross responded to Phillips' November 12,
2010 letter and, among other things, reiterated that Carlisle Limited Partner had "NOT been part
of any conversations with [Compass], as we have repeatedly requested…. We repeat that a) we
need to have a joint call with Compass or in-person meeting as soon as possible and b) as a
majority equity partner and per the partnership agreement, we need to be involved in all
discussions and decisions."

47.     On October 15, 2010, Gross again e-mailed Phillips asking why he had not yet
arranged a call with Compass.

48.     When Phillips failed to respond, RECP directly contacted John Brodie, the notice
party at Compass in the Loan Agreement. Contrary to Phillips' representations to Carlisle
Limited Partner, Brodie suggested a willingness on the part of Compass to discuss a short loan
extension.

**McCullough Harris Requires Carlisle Limited Partner To
Communicate With Litigation Counsel**

49.     On October 18, 2010, Schulder received a letter from Phillips that made no
mention of any of the prior correspondence and, instead, simply informed the limited partner that
Phillips was going to be out of town "attending meetings relative to a gubernatorial
appointment," and that his real estate counsel, Sandy Solomon, would "assist in addressing the
issues. . . ." Solomon followed up with an e-mail later that day reiterating that he represented
Phillips and McCullough Harris and that Carlisle Limited Partner was to direct all inquiries about
the Property to him.

50.     Solomon, also wrote that Carlisle Limited Partnership could participate in communications with Compass "so long as we [*i.e.*, McCullough Harris] know in advance your goals and objectives as well as your proposed strategy for the communication/negotiation.... [B]ut we cannot allow random, unsolicited, and unplanned approaches to the lender at this time."

51.     Solomon is a litigator and has very little experience in the types of negotiations Carlisle Limited Partner sought to engage with Compass.  Thus, as the Maturity Date rapidly approached, Carlisle Limited Partnership was barred from speaking with its general partner in the Partnership and, instead, forced to speak to the general partner's litigation attorney.

52.     On October 21, 2010, Schulder participated in a telephone conference with Solomon, several of his colleagues at RECP, and RECP's counsel, Jill Anderson.  The next day, following up on the topics of the call, Anderson forwarded a summary of the plan RECP had proposed for a conference with Compass for the purposes of seeking an extension to the Loan.

53.     Neither Solomon nor Phillips responded and so, on Wednesday, October 27, 2010, Schulder e-mailed Don Phillips and Sandy Solomon inquiring if they had reviewed the proposed course of action.

54.     Solomon responded on October 28, 2010 that he was involved in a trial and did not review RECP's proposal.  Schulder therefore re-sent Anderson's October 22, 2010 e-mail. Once again, he received no response, so Schulder e-mailed Solomon and Phillips again on October 29, 2010 seeking a response to the plan to speak with Compass.

55.     Schulder again received no response and so, on November 2, 2010, he sent yet another e-mail asking for a response to RECP's proposal.

56.     Finally, on November 4, 2010, Schulder spoke with Victoria Cruz-Garcia, an attorney in Solomon's office.  Following that call, Cruz-Garcia e-mailed Schulder that

McCullough Harris had initiated contact with Brodie at Compass and that he had referred McCullough Harris to outside counsel.  Cruz-Garcia also wrote that McCullough Harris had "succumbed to [Carlisle Limited Partner]'s wishes to contact the Bank without a multi-step game plan laid out in advance to the conference."  Schulder replied by e-mail at 4:34 P.M. that RECP had, in fact submitted such a "game plan" and that Carlisle Limited Partner "would like to schedule the call for sometime tomorrow, **and we will avail ourselves at any reasonable time, as we too understand the time constraints.**"  (emphasis added).

57.     Gross called Brodie that day to inquire as to why he was involving Compass's outside counsel.  Brodie informed her that it was not McCullough Harris that contacted him, but rather it was McCullough Harris's legal counsel.  Furthermore, according to Brodie, this phone call occurred after McCullough Harris's lawyers had written the bank a letter containing a variety of accusations and allegations.  For that reason Brodie told Gross that he referred McCullough Harris's lawyers to Compass's outside counsel.

58.     Brodie also forwarded an e-mail from the night of November 4, 2010.  In this e-mail, Cruz-Garcia wrote to Compass's outside counsel, Brett Hamilton, that RECP was "**not available in the morning**" (emphasis added).  This was a flat-out lie and directly contradicted Schulder's e-mail from earlier that afternoon.

59.     On November 5, 2010, Anderson received the results of a title search on the Property that she had requested, and she forwarded those results to Schulder by email.  Those results included her discovery of the lis pendens filed on the Property.  It was only then that RECP learned about the lawsuit filed on the Partnership's behalf against Compass.  Compass did not learn of the lawsuit filed against it until Gross mentioned it on the phone to Brodie that same day.

**Carlisle Limited Partner Exercises Its Contractual Right**
**To Convert McCullough Harris Into A Limited Partner**

60.     As set forth above, McCullough Harris's filing of the lawsuit breached Section

10.4 of the LPA.  Any breach of Section 10.4 of the LPA constitutes a "Defaulting Event" in the

LPA.  Likewise, any "willful misconduct, gross negligence . . . dishonesty, or breach of fiduciary

duty" also constitutes a "Defaulting Event" under the LPA.

61.     Pursuant to Section 18.1 of the LPA, in the event of any Defaulting Event, and, if

[Carlisle Limited Partner] elects under Section 21.1 to continue the partnership notwithstanding

the happening of such Defaulting Event. . . then, at [Carlisle Limited Partner]'s option, the

[McCullough Harris]'s entire interest in the Partnership as a General Partner shall be converted

into the interest of a limited partner. . . ."

62.     Moreover, pursuant to Section 18.1(c), in the event of such a conversion, Carlisle

Limited Partner was to appoint a new general partner within 90 days thereof.

63.     Pursuant to Section 10.5(d) of the LPA, in the event of a conversion of

McCullough Harris's interests into that of a limited partner, Carlisle Limited Partner is "entitled

to cause the termination of the Management Agreement as of the Conversion Date. . . ."

64.     Thus, the LPA specifically endows Carlisle Limited Partner with the right to

remove McCullough Harris as the general partner and terminate Ovation as the property manager

in response to the breaches of the LPA engaged in by McCullough Harris described herein.

65.     Accordingly, on November 12, 2010, citing relevant provisions of the LPA

permitting such action, Carlisle Limited Partnership sent notice to Phillips, that, among other

things, it was converting McCullough Harris's general partnership interest in the Partnership into

that of a limited partner without any rights or obligations to participate in the management of the

Partnership and without any approval rights under Section 10.4 or otherwise under the LPA, and

that Carlisle Limited Partnership had appointed Carlisle GP to be the new general partner of the Partnership.

66.     The letter demanded that McCullough Harris immediately cooperate with the transfer of all keys, security codes and necessary records for the day-to-day operations of the Property.  Further, by 10 A.M. on Monday November 15, 2010, McCullough Harris was required to transfer all information to control the Partnership's bank accounts, all leases, contracts, and warranties related to the Property, all maintenance records related to the Project, and all books and records of the Partnership and the Property.

**Carlisle GP Takes Over As General Partner**

67.     On November 12, 2010, Carlisle GP wrote a letter to Ovation, the property manager for the Property, and informed it that any management agreement between it and McCullough Harris had been terminated.[2]

68.     Schulder arrived at the Property with representatives of the new property manager hired by Carlisle GP, GREP Southeast, LLC ("GREP").  He informed Ovation's employees that Ovation was no longer the manager of the Property.

69.     Schulder learned from the on-site manager that at least one potential "investor" of the Property had visited to conduct extensive due diligence, that Phillips had barred him from informing RECP of this due diligence review, and that a deal for the Property was apparently imminent.

**McCullough Harris Disputes Carlisle GP's Entitlement To Act As General Partner**

70.     Shortly after new management took charge, the police arrived with their guns drawn.  After the situation had calmed down, an officer informed Schulder that they were

---

[2]     Contrary to Section 10.5(b) of the LPA, Carlisle Limited Partner has not been provided a copy of a management agreement.

responding to a call that there was an emergency onsite.  Later, a management employee from one of Phillips's other properties arrived and informed Schulder that she had called the police because Phillips had told her that he had surveillance capabilities with respect to the Property's management office and that there was a hostile situation and the staff on site were unable to dial 911.

71.     An attorney named Lex Erwin representing McCullough Harris and/or Don Phillips also arrived at the Property and asked the police to remove Schulder and the GREP employees for trespassing.

72.     Thereafter, Erwin filed a complaint and motion for a Temporary Restraining Order against Carlisle Limited Partner, Carlisle GP, and GREP in Mecklenburg County Superior Court in Charlotte, North Carolina.  The LPA, however, contains an exclusive jurisdiction clause, laying proper venue for any dispute relating to or arising from the LPA in the state and federal courts of New York County.  Thus, the action brought in North Carolina was in violation of the terms of the LPA.

73.     Erwin represented that McCullough Harris sought a restraining order barring Carlisle GP from acting as the general partner for the Partnership and requiring Carlisle GP to restore Ovation as the property manager.

74.     The judge reviewed the papers filed by Erwin and heard arguments from Erwin and counsel representing RECP, Carlisle GP and the Partnership for over one hour.  Erwin represented that a deal for the Property was to be executed on Thursday, November 16.  At the conclusion of the argument, the judge denied McCullough Harris's motion.

**McCullough Harris' Obstruction Appears To Be Part of A**
**Scheme To Destroy Carlisle Limited Partner's Equity**

75.     Phillips' behavior detailed herein suggests that he might be scheming to strike a

secret deal with a third party purchaser of the Loan, subsequently foreclose on the Loan, and

wipe out Carlisle Limited Partner's interest – similar to what he alleges to have done in the Tonti

deal.  In such a deal, Phillips could secretly agree to invest a small amount of additional equity in

a new partnership with the buyer of the Loan.  Phillips would be the new general partner and

manager of the property, and the buyer of the Loan would be the new limited partner.  Phillips,

in his involvement with Carlisle Limited Partner, would continue to delay conversations with

Compass or other potential sources of debt capital until the maturity of the Loan, then allow a

"friendly" foreclosure on the property, which would destroy Carlisle Limited Partner's equity in

the Property.

76.     Without Carlisle Limited Partner's knowledge, McCullough Harris authorized at

least one entity to conduct on-site due diligence of the property, further supporting the possibility

that McCullough Harris was working against Carlisle Limited Partner's interests.  Phillips may

have intended to use the filing of the Florida lawsuit and lis pendens and other allegations as a

means of encouraging Compass to sell the Loan to a buyer with which he has a deal.  Phillips

presumably intended to withdraw the lawsuit and lis pendens if Compass agreed to the sale to his

confederate.

77.     Phillips's efforts to run out the clock and obstruct the Partnership's ability to

obtain a Loan extension or other financing also may be part of the scheme.  This obstruction

facilitates a foreclosure on the Property; the Partnership simply will not have sufficient time to

make financial arrangement to salvage the Partnership's equity in the Property.  Going forward,

Phillips would benefit because his basis in the Property will be much lower (at or below the

current Loan amount).  As such, he will have equity in the same Property but with a decreased

debt burden (assuming the new partnership would finance the Loan purchase with debt at

prevailing market terms). In such a scenario, he would benefit far more from any future increase in the value of the Property, likely having a disproportionate share in any profits.

**The Current Status and The Need for Injunctive Relief**

78.     To date, McCullough Harris has not complied – and has evinced no intention of complying – with the demands to cooperate with the transfer of files, keys, or codes related to the Partnership or the Property.

79.     In order to act in its capacity as the general partner, Carlisle GP requires all the books and records of the Partnership and all material necessary to manage the Property.

**COUNT I**

**(DECLARATORY JUDGMENT)**

80.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-79 above, as if set forth fully herein.

81.     Pursuant to the terms of the LPA, McCullough Harris's filing of the lawsuit in Florida against the Lender without Carlisle Limited Partner's approval constituted a Defaulting Event, and thus Carlisle Limited Partner was entitled to convert the general partner interests of McCullough Harris into that of a limited partner without any rights or obligations to participate in the management of the Partnership and without any Approval rights.

82.     Pursuant to the terms of the LPA, McCullough Harris's filing of the lis pendens concerning the Property without Carlisle Limited Partner's approval constituted a Defaulting Event, and thus Carlisle Limited Partner was entitled to convert the general partner interests of McCullough Harris into that of a limited partner without any rights or obligations to participate in the management of the Partnership and without any Approval rights.

83.     Pursuant to the terms of the LPA, any breach of McCullough Harris's fiduciary duties or dishonesty on the part of McCullough Harris or any of its principals or personnel in the conduct of the Partnership's business were Defaulting Events that triggered Carlisle Limited Partner's right to convert the general partner interests of McCullough Harris.  The following acts constitute breaches of McCullough Harris's fiduciary duties or demonstrate his dishonesty:

a.   McCullough Harris's dishonesty with respect to negotiations and communications with Compass as set forth herein;

b.   Don Phillips's statements and actions that suggest he has been acting to protect his interests – and not those of the Partnership – with respect to loans entirely unrelated to the Partnership;

c.   McCullough Harris's unreasonable delays in commencing negotiations with Compass;

d.   McCullough Harris's refusing to permit communications with Don Phillips; and

e.   McCullough Harris' concealment of due diligence visits by at least one potential buyer.

As a result of these acts, McCullough Harris has committed material breaches of its fiduciary duties to Carlisle Limited Partner, and Carlisle Limited Partner was permitted to convert the general partner interests of McCullough Harris into that of a limited partner without any rights or obligations to participate in the management of the Partnership and without any Approval rights.

84.     In the event of a conversion of McCullough Harris's partnership interests, Carlisle Limited Partner was also entitled to appoint a new general partner pursuant to the LPA.

85.     On November 12, 2010, Carlisle Limited Partner exercised its contractual right to

convert McCullough Harris's general partner interests into those of a limited partner.

86.     That same day it appointed Carlisle GP to be the new general partner of the Partnership.

87.     As of the date of this Complaint, McCullough Harris has not cooperated with this appointment, has refused to acknowledge Carlisle GP as the general partner of the Partnership, and has interfered with Carlisle GP's efforts to conduct the business of the Partnership.

88.     Without the declaration sought herein, McCullough Harris will cause irreparable harm to the Carlisle Limited Partnership as forth herein.

89.     Without the declaration sought herein, McCullough Harris will also interfere with Carlisle GP's ability to function as the general partner of the Partnership.

90.     Accordingly, there is an actual, justiciable controversy between Plaintiffs and McCullough Harris with regard to Carlisle GP's status as the general partner of the Partnership, such that the need for declaratory judgment here is immediate and real.

91.     Pursuant to Section 7.4(c) of the LPA, the Partnership and the Carlisle Limited Partner have a first priority security interest in and to all of McCullough Harris's interest in the Partnership.  This lien secures, among other things, the Carlisle Limited Partner's rights to remove McCullough Harris in the event of McCullough Harris's "fraud, willful misconduct, gross negligence, theft, dishonest, or breach of fiduciary duty under the Act," and "any costs of collections and reasonable attorneys' fees" incurred by the Carlisle Limited Partner in enforcing its rights under subsection (d) of the definition of Defaulting Event or Section 7.4(c).

92.     Plaintiffs therefore request a declaration that:

        a.    Carlisle GP is the general partner of the Partnership and that it is the only entity authorized to conduct the business on behalf thereof; and

b.   pursuant to Section 7.4(c) of the LPA, Plaintiffs are entitled to attorneys'

fees and costs incurred for enforcement of its right to remove McCullough

Harris as a general partner to the Partnership.

## COUNT II
### (Breach of Contract)

93.     Carlisle Limited Partner repeats and re-alleges the allegations contained in paragraphs 1-92 above, as if set forth fully herein.

94.     The LPA is a valid and binding contract between the Carlisle Limited Partner and McCullough Harris.

95.     Pursuant to Section 10.4(h) of the LPA, defendant McCullough Harris shall not "prosecute, waive, settle or compromise any claims or causes of action of the Partnership against any third party (or parties). . ." without the consent of the Carlisle Limited Partner.

96.     On September 23, 2010, without Carlisle Limited Partner's knowledge or approval, McCullough Harris filed a lawsuit in Florida state court, Hillsborough County, on behalf of the Partnership against the Lender.

97.     McCullough Harris therefore breached Section 10.4(h) of the LPA.

98.     Pursuant to Section 10.4(d) of the LPA, defendant McCullough Harris shall not "subject all or any portion of the Partnership's property. . . to any Mortgage, lien or other encumbrance. . ." without the consent of the Carlisle Limited Partner.

99.     On or about September 28, 2010, without the knowledge or consent of Carlisle Limited Partner, McCullough Harris filed a lis pendens against the Partnership's Property in connection with the lawsuit filed in Florida.

100.    Any breach of Section 10.4 of the LPA is defined as a "Defaulting Event" in the LPA.

101.    McCullough Harris's course of conduct also constitutes a breach of fiduciary duty, which is also a Defaulting Event.  (*See* LPA, Definition of Defaulting Event, Subparagraph (d), p. 5.)

102.    Pursuant to Section 18.1 of the LPA, in the event of any Defaulting Event, and, "if [Carlisle Limited Partner] elects under Section 21.1 to continue the partnership notwithstanding the happening of such Defaulting Event. . . then, at [Carlisle Limited Partner]'s option, [McCullough Harris]'s entire interest in the Partnership as a General Partner shall be converted into the interest of a limited partner. . . ."  Further, in such event, Carlisle Limited Partner shall appoint a new general partner within 90 days of the date of such conversion.

103.    Moreover, pursuant to Section 18.1(c), in the event that the McCullough Harris' interest is converted, it is required upon demand to "execute and deliver to the Partnership all documents that may be necessary to effect such a conversion. . . ."

104.    McCullough Harris has refused to comply with Section 18.1 by, *inter alia,* rejecting Carlisle GP's right to be the new general partner and by refusing to deliver the documents necessary to effect the appointment of Carlisle GP as the new general partner.

105.    McCullough Harris therefore breached Section 18.1 of the LPA.

106.    Because of these breaches, Carlisle Limited Partner was entitled to appoint Carlisle GP as the new general partner to the Partnership.

**WHEREFORE,** Plaintiffs demand judgment against Defendant McCullough Harris LLC as follows:

a)   A declaratory judgment confirming Carlisle GP's right to act as general partner of the Partnership;

b) a permanent injunction, enjoining Defendants from interfering with Carlisle GP's right to act as general partner of the Partnership;

c) a mandatory injunction, requiring any necessary cooperation from McCullough Harris in order for Carlisle GP to act as general partner of the Partnership;

d) pursuant to Section 7.4(c) of the LPA, attorneys' fees and costs incurred for enforcement of its right to remove McCullough Harris as a general partner to the Partnership; and

e) For such other and further relief as the Court deems just and equitable.

Dated: New York, New York
November 17, 2010

SCHINDLER COHEN & HOCHMAN LLP

By:_____
Jonathan L. Hochman (JH 7072)
Andrew J. Melnick (AM 4209)
Matthew A. Katz (MK 4252)

100 Wall Street, 15th Floor
New York, New York  10005
Tel:    (212) 277-6300
Fax:    (212) 277-6333

*Attorneys for Plaintiffs Recap Investments XI – Fund A, L.P., Recap Investments XI – Fund B, L.P., and Carlisle GP, Inc.*